UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JACOB WALTZ,<br><br>    Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL,<br><br>    Defendant. | Case No. 17-cv-06654-LB<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION**<br><br>Re: ECF Nos. 26 & 27 |

## INTRODUCTION

Plaintiff Jacob Waltz seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for disability benefits under Title II and Title XVI of the Social Security Act.[1] He moved for summary judgment.[2] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[3] Under Civil Local Rule 16-5, the matter is submitted for decision by this court without oral argument. All parties consented to

---

[1] Compl. – ECF No.1 at 1; Motion for Summary Judgment ("Motion") – ECF No. 26 at 5–11. Record citations refer to the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Motion – ECF No. 26.

[3] Cross-Mot. – ECF No. 27.

magistrate-judge jurisdiction.[4] The court denies the plaintiff's motion and grants the Commissioner's cross-motion.

**STATEMENT**

### 1. Procedural History

On January 28, 2014, Mr. Waltz, born on August 28, 1971, filed claims for social-security disability insurance ("SSDI") under Title II of the Social Security Act[5] ("SSA") and supplemental security income ("SSI") under Title XVI.[6] He alleged affective disorder,[7] personality disorder, anxiety, chronic insomnia, degenerative disc disease, hypertension, blood clots in his right leg, Tendonitis in his left leg, sprains, and strains.[8] He alleged an onset date of September 15, 2011.[9] The Social Security Administration denied the application initially[10] and on reconsideration.[11] On February 19, 2015, Mr. Waltz requested a hearing.[12] On May 26, 2016, Administrative Law Judge ("ALJ") Suzanne Krolikowski held a hearing in San Rafael, California.[13] Attorney Dan McCaskell represented Mr. Waltz.[14] Mr. Waltz and vocational expert Robert Cottle testified in person.[15] On September 8, 2016, the ALJ issued an unfavorable decision.[16] Mr. Waltz appealed the decision to

---

[4] Consent Forms – ECF Nos. 5, 9.

[5] *See* AR 266–72. Administrative Record ("AR") citations refer to the page numbers in the bottom right hand corner of the Administrative Record.

[6] *See* AR 136–37.

[7] Specifically, as to his alleged affective disorder, Mr. Waltz alleged manic depression, bipolar disorder, restlessness, post-traumatic-stress disorder ("PTSD"), and obsessive-compulsive disorder ("OCD"). AR 102, 119.

[8] *See* AR 24, 102, 119.

[9] *See* AR 266, 273.

[10] AR 173–76, 177–81.

[11] AR 185–89, 190–94.

[12] AR 195–96.

[13] *See* AR 50–97.

[14] *See* AR 50.

[15] *See* AR 50–51.

[16] AR 19.

the Appeals Council on September 30, 2016.[17] On October 2, 2017, the Appeals Council denied his request.[18] On November 17, 2017, Mr. Waltz filed this action for judicial review[19] and subsequently moved for summary judgment on August 16, 2018.[20] The Commissioner opposed the motion and filed a cross-motion for summary judgment.[21]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Les Kalman, M.D., Psy.D. — Examining

On March 15, 2011, before the alleged onset date, and in connection with an earlier claim, Les Kalman, M.D., Psy.D., a psychiatrist, conducted a psychiatric evaluation of Mr. Waltz.[22] Mr. Waltz's chief complaint was that he was tired and experienced difficulty sleeping "for the past 26 years."[23] He reported feeling depressed, stressed, and anxious and experiencing auditory hallucinations telling him to hurt people.[24] He also reported past homicidal thoughts, which were not directed at anyone in particular.[25] His last job was in November 2010 as In Home Support Service for his mother.[26] He stated that he could no longer work in that capacity because he had difficulty caring for his mother and would "get mad at people or just feel too stressed."[27] Dr. Kalman noted that Mr. Waltz had no past psychiatric conditions.[28]

---

[17] AR 262–63.

[18] AR 1–6.

[19] Complaint – ECF No. 1.

[20] Motion – ECF No. 26.

[21] Cross-Mot. – ECF No. 27.

[22] AR 423–27.

[23] AR 423.

[24] AR 423, 425.

[25] AR 423.

[26] AR 424.

[27] *Id.*

[28] *Id.*

Dr. Kalman noted that Mr. Waltz was pleasant and cooperative, he spoke at an average rate and volume, and his eye contact was good.[29] Mr. Waltz's level of functioning included the following: doing his own shopping, cooking, and housekeeping; managing his own transportation; caring for his personal hygiene; and paying his bills.[30]

Dr. Kalman opined that Mr. Waltz was able to relate to supervisors, co-workers, and peers.[31] Mr. Waltz also was able to understand and carry out simple work instructions, maintain attention, concentration and memory, and withstand the stress and pressures associated with daily work.[32] Dr. Kalman diagnosed Mr. Waltz with cyclothymia,[33] ruled out schizoaffective disorder, and noted Mr. Waltz's sustained polysubstance dependence.[34]

### 2.1.2 Brookwood Health Center — Treating

Mr. Waltz visited Brookwood Health Center on various occasions from November 2011 through July 2014.[35] On November 28, 2011, Theresa Wade, a family nurse practitioner ("FNP"), saw Mr. Waltz regarding antidepressant medication.[36] Mr. Waltz stated that he had been "angry and raging" as well as "withdrawn from life, apathetic."[37] He reported hearing voices, "sometimes an actress's voice and sometimes voices he does not recognize. The voices t[old] him to hurt other people — to hit/kick/throw them on the ground."[38] He heard those voices "daily for the past 2

---

[29] *Id.*

[30] AR 425.

[31] *Id.*

[32] AR 425–26.

[33] "[T]he essential feature of Cyclothymic Disorder [cyclothymia] is a chronic, fluctuating mood disturbance involving numerous periods of hypomanic symptoms . . . and numerous periods of depressive symptoms." *Reynolds v. Apfel*, 1 F. Supp. 2d 223, 224 n.2 (W.D.N.Y. 1998) (internal citation omitted).

[34] AR 426.

[35] *See* AR 440, 446–47, 451–52, 462, 465–66, 472, 480–81.

[36] AR 480.

[37] *Id.*

[38] *Id.*

months consistently" when his "anger start[ed] up."[39] He also experienced some visual hallucinations.[40] FNP Wade noted that Mr. Waltz was stressed.[41] Based on FNP Wade's assessment, Mr. Waltz had the following conditions: psychosis; hypothyroidism; and insomnia.[42] FNP Wade prescribed Mr. Waltz Abilify for psychosis, Levothyroxine for hypothyroidism, and Amitriptyline for insomnia.[43] During a March 2012 visit, Mr. Waltz reported sleeping well since taking Elavil and Benadryl.[44]

In March 2013, FNP Wade saw Mr. Waltz regarding pain in the lower calf of his right leg.[45] Mr. Waltz stated that he had a blood clot in this leg approximately ten years prior.[46] Mr. Waltz admitted that he used "meth" in the past and that he had been using it again.[47] He also stated he may have hit his right leg while riding his bike but was uncertain.[48] He was living "on the streets" and wanted to do "the Orenda Center 31 day program and then their aftercare program" but needed to first save money for the programs.[49] FNP Wade noted that Mr. Waltz appeared to be pleasant, alert, and in normal affect and mood and that he walked with a limp.[50] FNP Wade referred him to ultrasound imaging to rule out deep-vein thrombosis ("DVT") in his right leg.[51] The ultrasound was unremarkable.[52]

---

[39] Id.

[40] Id.

[41] AR 481.

[42] Id.

[43] Id.

[44] AR 472.

[45] AR 465.

[46] Id.

[47] Id.

[48] Id.

[49] Id.

[50] Id.

[51] AR 466.

[52] AR 440.

In April 2014, Suegee Tamar Mattis, D.O., a doctor of osteopathic medicine and family practitioner, saw Mr. Waltz regarding Mr. Waltz's thyroid condition and throat pain.[53] Dr. Mattis noted that Mr. Waltz appeared pleasant, alert, and in normal affect and mood.[54] Dr. Mattis stated that Mr. Waltz likely had GERD (gastroesophageal reflux disease), rather than thyroid issues, and recommended that Mr. Waltz take Omeprazole.[55]

In July 2014, FNP Mary C. Papsco saw Mr. Waltz regarding insomnia and a mole on his cheek.[56] FNP Papsco reported that Mr. Waltz was not sleeping well. He did not sleep much at night and needed to sleep during the day to catch up on sleep.[57] He also needed a bed pass for Sam Jones, a homeless shelter.[58] FNP Papsco refilled Mr. Waltz's sleep medication.[59] In regard to the mole on his cheek, FNP Papsco noted that the mole was not normal and that she wanted to have it removed and tested.[60] She noted that it would swell up and sometimes break open and bleed.[61]

### 2.1.3    Michael Kozart, M.D. — Treating

On January 30, 2013, Michael Kozart, M.D., a psychiatrist, saw Mr. Waltz for a follow-up visit.[62] Mr. Waltz reported that he had been off his medications for "a while."[63] He was homeless and living outside under a bridge.[64] At the time, he was applying for General Assistance ("GA") benefits and was on food stamps and County Medical Services Program ("CMSP") benefits.[65] He

---

[53] AR 451.

[54] *Id.*

[55] AR 452.

[56] AR 446.

[57] *Id.*

[58] *Id.*; *see also* AR 534.

[59] AR 447.

[60] AR 446.

[61] *Id.*

[62] AR 467.

[63] *Id.*

[64] *Id.*

[65] *Id.*

had not yet applied for disability benefits.[66] His anger issues "remain[ed] a problem" and led to Mr. Waltz losing his job as a building manager in 2009.[67] Dr. Kozart treated an infection on Mr. Waltz's finger and advised that he quit smoking.[68]

In July 2013, Dr. Kozart saw Mr. Waltz regarding Mr. Waltz's medications.[69] Mr. Waltz stated that had not taken levothyroxine "for many months," intermittently took Metoprolol, and took 100–150 mg of Amitriptyline.[70] Mr. Waltz reported that he was homeless, living under a bridge, and had been clean and sober for four days.[71] He also reported that he "[s]till smokes MJ."[72] Dr. Kozart ordered lab tests and advised Mr. Waltz to continue Metoprolol and increase Amitriptyline, as needed, for sleep.[73]

Dr. Kozart saw Mr. Waltz again in February 2014.[74] Mr. Waltz reported that he applied for social security.[75] He stated he could not work because he had a learning disability.[76] He claimed he could not think "as fast as other people."[77] His last job was at Target, where he was supposed to re-stock items, but he "couldn't do it fast enough for his supervisors/managers."[78] "When he began to falter, [he] lost his patience, got angry, and was fired."[79] Dr. Kozart examined Mr. Waltz and

---

[66] Id.

[67] Id.

[68] AR 467–69.

[69] AR 463.

[70] Id.

[71] Id. The record also indicated that Mr. Waltz had "no [substance] use for 3 years." See id.

[72] Id.

[73] AR 464.

[74] AR 454.

[75] Id.

[76] Id.

[77] Id.

[78] Id.

[79] Id.

noted that Mr. Waltz appeared calm, spoke fluently, and was alert and logical.[80] Dr. Kozart also

noted that "[e]ssentially [Mr. Waltz] gets very angry when asked to complete tasks."[81]

On November 17, 2014, Dr. Kozart saw Mr. Waltz for psychiatric services.[82] Mr. Waltz

reported "a chronic inability to work due to a number of MH [mental health] issues," which Mr.

Waltz defined as "[d]epression, [a]nxiety, PTSD, [b]ipolar, [and] learning disability."[83] He

believed that because he had "been knocked out before, [his] brain doesn't work like other

peoples."[84] Also, his memory "doesn't work."[85]

Mr. Waltz reported that he had not pursued vocational rehabilitation therapy.[86] He also

reported that he had recovered from alcohol and hard drugs but was still using marijuana.[87] He

was still "homeless, outdoors" and stated that he did not stay at the Sam Jones shelter because he

wanted to spend time with family over the holidays.[88] Dr. Kozart recommended that Mr. Waltz

consider vocational rehabilitation, quit cannabis, and follow up with his therapist.[89]

### 2.1.4 Jamie Larson, Psy.D. — Examining

On July 26, 2014, Jamie Larson, Psy.D., a psychologist, conducted a psychiatric evaluation of

Mr. Waltz for disability purposes.[90] Mr. Waltz reported that a diagnosis of bipolar disorder,

chronic insomnia, and anxiety issues.[91] When asked to elaborate on his bipolar difficulties, Mr.

---

[80] *Id.*

[81] *Id.*

[82] AR 589.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.* "[I]n general, one only gets a 2 day pass from the shelter, and [Mr. Waltz] occasionally visits with family to spend more than 2 nights [sic]."

[89] AR 589–90.

[90] AR 428–32.

[91] AR 428.

Waltz stated that he was "frequently irritable."[92] Mr. Waltz reported various anxiety symptoms, including agitation, fearfulness, irritability, and difficulty concentrating.[93] He reported that his mood depended on the amount of sleep he got in any given night.[94] He also reported that he sank into a "deep depression" approximately four to five times per week and sometimes multiple times per day.[95]

In regard to his educational history, Mr. Waltz reported that he dropped out of high school in the 11th grade but then later returned.[96] He was kicked out of school "due to memory difficulties."[97] Mr. Waltz reported that he had never been formally diagnosed with a learning disability, and he had not taken special-education classes, but he expressed a suspicion that he should have been so diagnosed.[98] Regarding his work history, Mr. Waltz reported that he last worked in 2011 as a stocker for Target.[99] He was "fired because he could not fulfill his obligations due to his psychiatric symptoms."[100] Mr. Waltz denied current use of alcohol or drugs, stating that he had not used drugs since January 18, 2014.[101]

Mr. Waltz reported that, on a typical day, if he had not received much sleep, he lacked motivation and did "virtually nothing throughout the day."[102] If he had slept, he typically would shower, eat, go to the bread line, and hang out in parks; but he "usually stay[ed] to himself due to

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] AR 429.

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

United States District Court
Northern District of California

his anxiety."[103] Mr. Waltz reported "longing for the manic episodes" because they gave him "energy and focus" but would also "quickly fade into depression."[104]

Dr. Larson reported that Mr. Waltz was able to maintain focus throughout the evaluation with no need for redirection.[105] Mr. Waltz was well-groomed and dressed appropriately for the season.[106] He gave good eye contact and had a pleasant attitude.[107] No "loose associations or confusion" were indicated.[108] There was also no indication of psychotic thought processes, and Mr. Waltz denied suicidal and homicidal ideation.[109] Dr. Larson noted that Mr. Waltz's remote memory was "mildly impaired" and that his delayed recall was "severely impaired" — specifically, Mr. Waltz recalled "0/3 objects after a short delay and could not even guess."[110] Mr. Waltz's fund knowledge was moderately impaired.[111] He also indicated that he was unable to do calculations.[112]

Dr. Larson concluded that if Mr. Waltz were allotted benefits, he would likely require a payee.[113] Mr. Waltz appeared to have mild difficulty performing simple and repetitive tasks and moderate difficulty performing detailed and complex tasks.[114] "In particular, abstract thinking [was] quite challenging for him as all as any calculations," he appeared to get distracted, and had "some difficulty focusing."[115] Mr. Waltz overall had good insight.[116] Moreover, though Mr. Waltz

---

[103] *Id.*

[104] *Id.*

[105] AR 430.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] AR 432.

[114] *Id.*

[115] *Id*

[116] *Id.*

had only mild difficulty accepting instructions from supervisors, there was "a likelihood of moderate to severe difficulties interacting with coworkers and the public on a consistent basis."[117] Mr. Waltz "would likely need some additional instructions to perform work activities consistently."[118]

Dr. Larson further found that Mr. Waltz "would have severe difficulty maintaining regular attendance in the workplace or completing a normal workweek without disruptions from a psychiatric condition."[119] In addition, "stressors encountered in the workplace would lead to a likely rapid deterioration or decompensation of [Mr. Waltz's] functioning."[120]

### 2.1.5    Steven E. Gerson, D.O. — Examining

On August 14, 2014, Steven E. Gerson, D.O., a doctor of osteopathic medicine and internist, conducted an internal medicine evaluation of Mr. Waltz at the request of the Bureau of Disability Adjudication Services from California.[121] Mr. Waltz's chief complaint was chronic insomnia.[122] He reported that Amitriptyline "helped a little" with his sleep pattern.[123] He stated that he felt tired "almost all the time" and that his memory could be "off."[124] He also stated that when sleep deprived, he heard "more voices."[125] He reported that his insomnia was "gradually getting worse" over time.[126] He also reported "mild nonspecific pain in the midline lumbar spine."[127]

---

[117] Id.

[118] Id.

[119] Id.

[120] Id.

[121] AR 482–89.

[122] AR 482.

[123] Id.

[124] Id.

[125] Id.

[126] AR 483.

[127] AR 485.

Mr. Waltz reported that he quit drinking alcohol the year prior and that after he quit drinking, his sleep patterns worsened.[128] Mr. Waltz was not aware of any liver disease or any other problems resulting from prior alcohol consumption.[129] Mr. Waltz reported that, at thirty years old, he had DVT in his left leg.[130] He had chronic swelling of the left leg as a result of the DVT.[131] Mr. Waltz stated that he could walk up to half a mile at a time before stopping "due to the foot pain and flat feet."[132] He also stated that he could use a mobile bicycle for up to two to three miles at a time.[133]

Dr. Gerson noted that Mr. Waltz had smoked for twenty-four years and smoked half a pack of cigarettes per day.[134] He also noted that Mr. Waltz last worked in 2010 as a shelf-stocker at Target.[135] At the time of the exam, Mr. Waltz was well-developed, well-nourished, properly dressed, coherent, and cooperative.[136]

Dr. Gerson noted that Mr. Waltz was able to relate to him, follow instructions without difficulty, and was "not unstable."[137] He also noted that Mr. Waltz's short term memory was mildly decreased at times, and his long term memory was "grossly intact."[138] Mr. Waltz had no need for an assistive device.[139] Dr. Gerson diagnosed Mr. Waltz with chronic insomnia and histories of the following conditions: DVT; pes planus; elevated blood pressure; "possibly a little" arthritis; a bicycle injury with chest plate contusion and back pain; and thyroid disease.[140]

---

[128] AR 482.

[129] *Id.*

[130] AR 482–83.

[131] AR 483.

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.* According to other reports in the record, Mr. Waltz last worked — at Target — in 2011, not 2010. *See, e.g.*, AR 429.

[136] AR 484.

[137] AR 485.

[138] *Id.*

[139] *Id.*

[140] AR 486.

Dr. Gerson reported that Mr. Waltz had the following functional limitations: (1) occasionally lifting and carrying fifty pounds and frequently carrying and lifting twenty-five pounds; (2) standing and/or walking for up to six hours in an eight-hour workday; (3) frequently climbing, balancing, and kneeling and occasionally stooping/bending, crouching/squatting, and crawling; (4) and frequently restricted regarding heights and moving machinery due to insomnia and back pain.[141] Dr. Gerson also noted that Mr. Waltz carried a heavy backpack plus another heavy bag "without obvious pain, awkwardness or distress."[142]

### 2.1.6    Marcos Lopez, Ph.D. — Treating

Dr. Lopez treated Mr. Waltz on multiple occasions between January 2015 and March 2016.[143] On January 27, 2015, Dr. Lopez saw Mr. Waltz regarding Mr. Waltz's anxiety, bipolar disorder, blood clots in the right leg, and tendonitis in the left leg.[144] Mr. Waltz reported that he had alcohol problems in the past and was involved with AA (alcoholics anonymous).[145] He also reported that he was homeless and wanted to get SSI benefits.[146] Dr. Lopez indicated that Mr. Waltz had "[m]oderately severe depression."[147] Mr. Waltz reported that he was "clean and sober" and had not abused alcohol for three years.[148] Mr. Waltz had normal speech, appropriate appearance and behavior, and his thought process was intact coherent.[149] He reported memory problems.[150]

On December 21, 2015, Dr. Lopez completed a mental-residual functional-capacity questionnaire for Mr. Waltz.[151] As of that time, Dr. Lopez had treated Mr. Waltz "for the past

---

[141] AR 486–87.

[142] AR 487.

[143] *See, e.g.*, AR 556–58, AR 540–41, AR 538–39.

[144] AR 556.

[145] *Id.*

[146] *Id.*

[147] AR 556–58.

[148] AR 557.

[149] *Id.*

[150] *Id.*

[151] AR 491–95.

year, approximately once every month."[152] He reported that Mr. Waltz "suffer[ed] from significant insomnia [and] manic symptoms that le[d] him to engage in risky behaviors (e.g. sexual promiscuity)."[153] Dr. Lopez noted that Mr. Waltz's response to treatment had been "minimal due to significant stressors (homeless [and] no [f]inancial income)."[154] Dr. Lopez identified the following signs and symptoms: impairment in impulse control; generalized persistent anxiety; sleep disturbance; substance dependence (past); memory impairment; and decreased need for sleep.[155]

In regard to Mr. Waltz's ability to do work-related activities on a day-to-day basis, Dr. Lopez opined as follows. As to Mr. Waltz's mental ability and aptitude to do unskilled work, Dr. Lopez opined that Mr. Waltz was "[s]eriously limited, but not precluded" in the following five (out of sixteen total) categories: (1) maintaining attention for two hours; (2) maintaining regular attendance and punctuality; (3) completing normal workday and workweek without interruptions from psychologically based symptoms; (4) performing at consistent pace without an unreasonable number and length of rest periods; and (5) dealing with normal work stress.[156] Mr. Waltz's work-related abilities were "limited but satisfactory" with regard to remembering work-like procedures, understanding, remembering, and carrying out "very short and simply instructions," sustaining an ordinary routine without special supervision, make simple work-related decisions, getting along with co-workers or peers without "unduly distracting them or exhibiting behavioral extremes," and responding appropriately to changes in a routine work setting, amongst other tasks.[157] Dr. Lopez further provided that Mr. Waltz's "attention [and] ability to focus and ability to maintain a

---

[152] AR 491.

[153] Id.

[154] Id.

[155] AR 492.

[156] AR 493.

[157] Id.

1   consistent schedule is severely impaired due to his manic symptoms inhibiting his ability to sleep

2   (suffer from insomnia), as well as imparting his impulse control."[158]

3   As to Mr. Waltz's ability to aptitude to do semiskilled and skilled work, Dr. Lopez opined that

4   Mr. Waltz was "[s]eriously limited, but not precluded" in each of the four categories: (1)

5   understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3)

6   setting realistic goals or making plans independently of others; and (4) dealing with stress of

7   semiskilled and skilled work.[159]

8   As to Mr. Waltz's ability and aptitude to do particular types of jobs, Dr. Lopez opined that Mr.

9   Waltz could do the following without limitation: (1) adhere to basic standards of neatness and

10  cleanliness; (2) travel in unfamiliar places; and (3) use public transportation.[160] Mr. Waltz's

11  abilities were "[l]imited but satisfactory" regarding interacting appropriately with the general

12  public and maintaining socially appropriate behavior.[161]

13  Dr. Lopez stated that Mr. Waltz's impairments lasted, or could be expected to last, at least

14  twelve months.[162] He also stated that Mr. Waltz was not a malingerer.[163] Dr. Lopez opined that

15  Mr. Waltz would have difficulty working at regular job on a sustained basis because his "lack of

16  permanent housing is a severe barrier" as well as "the insomnia that accompanies it" and "issues

17  of safety."[164] Dr. Lopez stated that Mr. Waltz could manage benefits in his best interests and that

18  Mr. Waltz did not have a low IQ or reduced intellectual functioning.[165]

19

20

21

22  ───────────────

[158] *Id.*

23  [159] AR 494.

[160] *Id.*

24  [161] *Id.*

[162] AR 495.

25  [163] *Id.*

26  [164] *Id.*

27  [165] *Id.*

28

Dr. Lopez treated Mr. Waltz again January 29, 2016.[166] They discussed recent events that contributed to Mr. Waltz's "depressive emotional state," including relationship problems and an argument Mr. Waltz had with his mother.[167] Dr. Lopez recommended that Mr. Waltz practice "grounding tools" to improve his mood and consider writing letters to cope with the loss of his friend.[168]

On March 16, 2016, Dr. Lopez saw Mr. Waltz for a follow-up session.[169] Dr. Lopez noted Mr. Waltz's bipolar disorder, homelessness, and substance abuse in remission.[170] Mr. Waltz reported improvements in his personal relationships.[171] Dr. Lopez provided Mr. Waltz with acupressure beads to use in his ears at the Shen Men, Liver, and Lung points.[172] Dr. Lopez reported that Mr. Waltz's speech was normal, his appearance and behavior were appropriate, his thought process was intact and coherent, and he had no memory problems.[173]

### 2.1.7 Scott Karpowicz, M.D. — Examining

On February 13, 2015, Scott Karpowicz, M.D, a family-medical doctor, examined Mr. Waltz and discussed his GA paperwork.[174] Dr. Karpowicz noted that Mr. Waltz applied for and was denied SSI benefits.[175] Mr. Waltz reported that he was knocked unconscious at five years old and that "things just don't register."[176] He felt like his brain worked "much more slowly than other

---

[166] AR 540–41.

[167] AR 540.

[168] AR 541.

[169] AR 538.

[170] Id.

[171] Id.

[172] Id.

[173] Id.

[174] AR 583.

[175] Id.

[176] Id.

people's."[177] Mr. Waltz reported difficulty with insomnia, anxiety, and "bipolar at times."[178] When he had a job, he got angry and had a difficult time with the schedule.[179] He stated that it was difficult to find a job because he had "been on SSI for 9 years previously."[180]

Dr. Karpowicz opined that it was "[n]ot entirely clearly to [him] what the underlying diagnosis is."[181] It was also not clear whether Mr. Waltz had "a severe enough illness that would make him completely unfit for work."[182] To the contrary, Dr. Karpowicz opined that it "may in fact be harmful for [Mr. Waltz] to continue to be out of the workforce."[183] Dr. Karpowicz agreed to order one month of GA benefits for Mr. Waltz "to give him time have additional psychiatric follow up to determine firm diagnosis and appropriateness of disability."[184]

### 2.1.8    Santa Rosa Memorial Hospital — Treating

In March 2015, Mr. Waltz visited the emergency room for a rash on his face.[185] Mr. Waltz was treated for a similar rash ten days prior.[186] Physician Assistant ("PA") Isis A. Laland noted that Mr. Waltz had cellulitis on his forearms, redness on his neck, face, and arms, and an itchy rash on his chest and shoulders.[187] PA Laland also noted that Mr. Waltz lived in a homeless shelter (Sam Jones) and bathed in a communal bathing facility.[188] PA Laland diagnosed Mr. Waltz with tinea

---

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.*

[183] *Id.*

[184] *Id.*

[185] AR 534.

[186] *Id.*

[187] *Id.*

[188] *Id.*

corporis and prescribed him cephalexin, hydrocortisone, hydroxyzine, and ketoconazole.[189] During the exam, Mr. Waltz's mood, affect, and speech were normal.[190]

In November 2015, Mr. Waltz visited the emergency room for back pain.[191] Mr. Waltz reported that, the week prior, he fell off his bike as he rode it down a flight of stairs.[192] Mr. Waltz was ambulatory and had no incontinence.[193] He received a "back — lumbar" x-ray, which indicated chronic back pain and degenerative disc disease at L5-S1.[194] Mr. Waltz had no fractures in his back nor significant arthritis changes.[195] Rather, he likely had muscle spasms.[196]

### 2.1.9    Corinne Duncan, N.P. — Treating

In January 2016, Corinne Duncan, a nurse practitioner ("NP"), saw Mr. Waltz for severe back pain and a medication refill.[197] Mr. Waltz felt pain in his low- and mid-back after he lifted heavy things while helping his friend move.[198] Mr. Waltz reported no substance abuse and that he had been sober for three years.[199] NP Duncan noted that Mr. Waltz was pleasant, alert, and "clearly uncomfortable with pain."[200] She prescribed Mr. Waltz gel for eczema and recommended that if his back pain persisted for more than one week, he should return to the clinic for a physical therapy referral.[201]

---

[189] AR 537.

[190] AR 536.

[191] AR 506–10.

[192] AR 506.

[193] *Id.*

[194] AR 510.

[195] *Id.*

[196] *Id.*

[197] AR 560.

[198] *Id.*

[199] *Id.*

[200] *Id.*

[201] AR 561.

### 2.1.10   J. Schnitzler, D.O. — Non-Examining[202]

On August 27, 2014, J. Schnitzler, D.O., a state agency psychological and psychiatric

consultant, opined as follows.[203] No objective evidence supported Mr. Waltz's alleged bipolar

disorder.[204] Mr. Waltz was able to

> maintain focus throughout [his] evaluation with no need for redirection. He was well
> groomed and dressed appropriately for the season. Overall attitude was described
> most appropriately as pleasant. Conversational flow was relatively normal. No
> indications of psychotic process. Mood remained neutral throughout the evaluation
> and affect was consistent.[205]

Mr. Waltz could perform simple "1–2 step tasks with limited public contact."[206]

### 2.1.11   D. Pong, M.D. — Non-Examining[207]

In August 2014, D. Pong, M.D., a state agency medical consultant, opined that Mr. Waltz

could do (1) occasionally lift or carry fifty pounds and frequently lift and carry twenty-five

pounds, and (2) stand, walk, or sit for approximately six hours in an eight-hour workday.[208] In

addition, Mr. Waltz was required to avoid concentrated exposure to hazards such as machinery

and heights.[209]

### 2.2   Mr. Waltz's Testimony

At the May 26, 2016 hearing before the ALJ, Mr. Waltz testified as follows.[210] He lived at a

homeless shelter with approximately 120 others and got along with them "fairly well."[211] He had

---

[202] In January 2015, L. Gottschalk, M.D., another non-examining state agency psychological and
psychiatric consultant, completed a mental residual functional capacity assessment that mirrored that
of Dr. Schnitzler. *See* AR 148–51.

[203] AR 110, 127.

[204] AR 110, 127.

[205] AR 110, 127.

[206] AR 110, 127.

[207] In January 2015, A. Pan, M.D., another non-examining state agency medical consultant, completed
a residual functional capacity assessment that mirrored that of Dr. Pong. *See* AR 147–48.

[208] AR 129.

[209] AR 130.

[210] *See* AR 61–93.

[211] AR 62.

insomnia, so he slept during the day and went out at night, to AA (alcoholics anonymous) and NA (narcotics anonymous) meetings.[212] At the shelter, Mr. Waltz did laundry for the house — for example, he did nine loads the night before the hearing.[213] To get around during the day or at night, Mr. Waltz rode a bicycle or the bus.[214]

In regard to his education, Mr. Waltz testified that he was "pretty much thrown out" of high school in the 11th grade.[215] He believed his insomnia "had a lot to do with that."[216] He never received his GED.[217] He last worked in September 2011[218] at Target as a shelf-stocker but was "fired" because the job was "too complicated" for him.[219] He "only worked there two months" before he was fired.[220] He "couldn't understand exactly where everything went," even when his job was to restock the "easiest section . . . [he] just couldn't do it."[221] He was trained "numerous times" but still could not handle the task.[222] He testified that he had sleep issues at that point.[223]

The ALJ pointed out that one of Mr. Waltz's doctors recommended that Mr. Waltz do vocational rehabilitation.[224] Mr. Waltz testified that he had not tried vocational rehabilitation but, if he did, he would "work someplace . . . like a Goodwill and [he] probably w[ould] look into

---

[212] *Id.*

[213] *Id.*

[214] AR 63.

[215] AR 64.

[216] *Id.*

[217] AR 64–65.

[218] It is not entirely clear from the record when Mr. Waltz began working at Target, or for how long. He testified that he "believe[d]" he started in February 2011, *see* AR 87, but also testified that his last job was at Target in September 2011, *see* AR 65. If Mr. Waltz worked at Target from February 2011 through September 2011, he clearly worked at that job for more than two months.

[219] AR 65.

[220] AR 87.

[221] AR 77.

[222] AR 78.

[223] *Id.*

[224] AR 65.

it."[225] It was just "really far" from where he stayed at that time.[226] He further testified that he used to volunteer at Interlink, a mental-health service, which was also a "long distance" — about eleven miles — from his current housing.[227] He stated that he would "probably try to start going back [to Interlink] too."[228] There, he used to water flowers, clean, and wash dishes.[229]

Mr. Waltz testified that he could not perform the above tasks at a job full-time.[230] Instead, he could do them when he had "the energy or like in small amounts" because he got "too easily confused," would "start misunderstanding stuff," and only got "periodic sleep."[231]

Mr. Waltz previously worked full-time at the Casual Male store as a sales person.[232] His boss, another AA member, was "very lenient" and gave him breaks because it took Mr. Waltz "a long time to learn stuff."[233] It took him "a long time to learn what how to do what was supposed to be done" at the store.[234] Mr. Waltz used the cash register and rang up purchases for customers.[235] He testified that "[f]or the most part," the cash register came up correct and that there "wasn't ever an issue" with him entering the wrong amounts or forgetting the amounts.[236] He estimated that he probably stood and walked "6 out of 10 hours" while he worked at the store but later testified that he sat for "half the day."[237] Mr. Waltz testified that he probably lifted twenty pounds at the job.[238]

---

[225] AR 66.

[226] *Id.*

[227] *Id.*

[228] *Id.*

[229] *Id.*

[230] *Id.*

[231] AR 66–67.

[232] AR 67, 83.

[233] AR 67.

[234] AR 80.

[235] AR 67.

[236] AR 80.

[237] AR 68–69.

[238] AR 69.

He called in sick "[n]ot very often . . . [m]aybe once or twice."[239] Mr. Waltz worked at the store for "[a] little over" one year.[240] He voluntarily quit that job because he "wasn't going anywhere with it" and "seemed like [he] was stuck in the same spot."[241]

Mr. Waltz testified that at age nineteen, he was involved in a major car accident where he was thrown from a car as it rolled.[242] He was unconscious for three days, and he could not remember his name or age following the accident.[243]

In 2005, Mr. Waltz worked part-time as a caregiver for his mother.[244] He never looked into working as a caregiver for others.[245]

Mr. Waltz testified that his insomnia, bipolar disorder, and depression prevented him from working.[246] He also stated that his "motivation is like real down" and that he "just can't sleep."[247] Mr. Waltz took hydroxyzine, amitriptyline, and melatonin for insomnia and Elavil for both insomnia and bipolar disorder.[248] His sleep medication helped him fall asleep "sometimes," but he still slept "about five nights out of seven."[249] Mr. Waltz also testified that seeing his psychologist, Dr. Lopez, "help[ed him] to relax some."[250] Mr. Waltz stated that Dr. Lopez gave him techniques for sleep and "[p]robably for bipolar."[251] Mr. Waltz testified that he also had anxiety "since [he] was younger."[252]

---

[239] AR 83.

[240] AR 80–81.

[241] AR 82–83.

[242] AR 78.

[243] *Id.*

[244] AR 69–70.

[245] AR 70.

[246] *Id.*

[247] *Id.*

[248] *Id.*

[249] AR 71–72.

[250] AR 72–73.

[251] AR 73.

[252] *Id.*

Mr. Waltz testified that he had a history of alcohol and drug abuse but had been sober since January 9, 2014.[253] He was sober between March 2007 and February 2011[254] and not sober from February 2011 to January 9, 2014.[255] He testified that he was clean when he worked at Target in 2011.[256] He tried heroin and meth "a little bit . . . occasionally, but [he] never mainlined with drugs, [he] never sho[t] a needle in [his] arm" to get high.[257] He tried smoking crystal meth "a few times" but "didn't do a whole lot" for him, and he did not "much care for it" because he "already [had] sleep issues."[258] Alcohol helped him "pass out," but he still struggled with sleep when he drank.[259] Marijuana helped him sleep; he used to smoke a "couple joints" of marijuana per week.[260]

In regard to Mr. Waltz's claimed blot clots and tendonitis, he testified that "both of [his] legs are okay . . . . [He] can't walk too far because it might start to ache a little bit and they can get a little sore sometimes when [] riding [his] bicycle, but . . . they've healed very well."[261] He could walk "probably half a mile" and rode his bicycle "three or four miles . . . maybe five."[262] He attended "about four or five" AA meetings per week, and he sometimes hung out with friends.[263] He also testified that he had never undergone therapy to improve his cognitive ability (*i.e.*, memory and concentration).[264] Furthermore, Mr. Waltz believed that he had a learning disability,

---

[253] *Id.*

[254] Mr. Waltz could not recall whether he began using drugs and alcohol again in February 2011 or April 2011. AR 84–85.

[255] AR 84–85.

[256] AR 74.

[257] *Id.*

[258] *Id.*

[259] AR 85.

[260] AR 85–86.

[261] AR 75.

[262] *Id.*

[263] AR 76.

[264] *Id.*

1    although he was never so diagnosed.[265]

2    **2.3    Vocational Expert Testimony**

3    Robert Cottle, a vocational expert ("VE"), also testified at the May 26, 2016 hearing.[266] The

4    ALJ posed the following hypothetical:

> [A] hypothetical individual [of] the claimant's age and education and with the past
> jobs [of sales representative, general merchandise; DOT 279-357-014; SVP 4; light
> strength] . . . . [T]his individual is limited to medium work as defined in the
> regulations except frequent balance, stoop, kneel, crouch, crawl, and clime ramps
> and stairs. So those are all frequent. No climbing ropes, ladders, or scaffolds; no
> exposure to high-exposed places or moving mechanical parts; and can understand,
> remember, and carry out simple instructions and make simple work-related
> decisions, can tolerate occasional interaction with the public.[267]

10    VE Cottle testified that such a hypothetical individual could not perform any of Mr.

11    Waltz's past jobs as actually performed or generally performed in the national economy.[268]

12    He further testified that such a hypothetical individual could perform other kinds of

13    work.[269] Specifically, VE Cottle testified that such an individual could work as a laundry

14    worker (DOT 361.685-018; SVP 2; medium strength; nationally, 199,300), dryer attendant

15    (DOT 581.686-018; SVP 1; medium strength; 106,200) or box bender (DOT 641.687-010;

16    SVP 1; medium strength; nationally, 206,600).[270]

17    VE Cottle then considered a second hypothetical: the individual in the first

18    hypothetical was limited to frequent interaction with coworkers and occasional interaction

United States District Court
Northern District of California

---

[265] AR 81.

[266] AR 88–97.

[267] AR 89–90.

[268] AR 90.

[269] *Id.*

[270] AR 90–92. VE Cottle initially testified that such an individual could also work as a linen room attendant, but then eliminated that possibility because it was "not [] simple" and "some judgment [] involved" in that job. AR 91–92.

with supervisors.[271] VE Cottle indicated that the jobs of laundry worker, dryer attendant, and box bender would still apply.[272]

VE Cottle considered a third hypothetical: the individual in the first hypothetical could perform routine tasks at a consistent pace but not at a production rate pace, where each task must be performed according to a strict deadline.[273] He testified that such an individual could work as a laundry worker, dryer attendant, or frame stripper (DOT 559.687-046; SVP 1; medium strength; nationally, 426,700).[274] That individual could not work as a box bender.[275]

VE Cottle testified that if the third hypothetical individual were off task for fifteen to twenty percent of the day, such an individual would not be able to perform the jobs of laundry worker, dryer attendant, or frame stripper.[276] That individual could perform those jobs, however, even if off task for five percent of the day.[277]

He further testified that if an individual needed to miss more than three days per month of work, such an individual would not be able to perform any of the above-mentioned jobs.[278] Likewise, if an individual "needed additional instructions well beyond that of a normal employee" for one-third of the time, such an individual would not be able to perform any of those jobs.[279] Finally, if an individual occasionally "was not able to get alone with coworkers and supervisors one-third of the workday," such an individual could not perform any of those jobs.[280]

---

[271] AR 92.

[272] *Id.*

[273] *Id.*

[274] AR 92–93.

[275] AR 92.

[276] AR 93.

[277] *Id.*

[278] AR 94.

[279] AR 94–95.

[280] AR 95.

## 2.4    Administrative Findings

The ALJ followed the five-step sequential evaluation process to determine whether Mr. Waltz was disabled and concluded that he was not.[281]

At step one, the ALJ found that Mr. Waltz had not engaged in substantial gainful activity since September 15, 2011.[282]

At step two, the ALJ found that Mr. Waltz had the following severe impairments: chronic insomnia; degenerative-disc disease; hypertension; affective disorder; personality disorder; anxiety and sprains and strains.[283] The ALJ found that Mr. Waltz had several non-severe impairments, including but not limited to deep-vein thrombosis, tendonitis, hypothyroidism, chronic skin conditions, and a back sprain.[284] The ALJ also found that Mr. Waltz's alleged learning disability was not a medically determinable impairment.[285]

At step three, the ALJ found that Mr. Waltz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[286] In addition, no treating or examining physician had mentioned findings equivalent in severity to the criteria of any listed impairment.[287] Specifically, the ALJ found that, with respect to Mr. Waltz's hypertension (which was evaluated by reference to specific body systems), there was no evidence in the record of a specific body system so affected as to meet a listing.[288] With respect to Mr. Waltz's degenerative-disc disease, the ALJ found that it did not meet Listing 1.04 (disorders of the

---

[281] AR 23–39.

[282] AR 24.

[283] AR 24–25.

[284] AR 25.

[285] *Id.*

[286] AR 25–28.

[287] AR 25.

[288] AR 25–26.

spine) because the record did not demonstrate any compromise of a nerve root or the spinal cord with any additional findings.[289]

The ALJ also found that Mr. Waltz's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of any of the following listings: 12.04 (affective disorder); 12.06 (anxiety-related disorders); 12.08 (personality disorders); and 12.09 (substance addition disorders).[290] In making such a determination, the ALJ considered whether Mr. Waltz's mental impairments resulted in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[291]

With respect to (1), the ALJ found that Mr. Waltz had only mild restrictions in activities of daily living.[292] Mr. Waltz could, for example, prepare his own meals and cook at his shelter, use public transportation independently, walk, ride his bicycle, do laundry, frequently volunteer at Interlink doing gardening and cleaning, shop in stores, and remember and attend appointments.[293]

With respect to (2), the ALJ found that Mr. Waltz had moderate difficulties in social functioning.[294] Specifically, on the one hand, Mr. Waltz sometimes had conflict with others (which resulted in losing a job), had issues with crowds, and did not socialize often with friends due to feelings of anxiety or depression.[295] On the other hand, Mr. Waltz got along well with

---

[289] AR 26.

[290] *Id.*

[291] *Id.*

[292] *Id.*

[293] *Id.*

[294] *Id.*

[295] *Id.*

authority figures and felt he had no problem getting along with family or friends.[296] He also was involved in a satisfying relationship with an individual at his homeless shelter.[297]

With respect to (3), the ALJ found that Mr. Waltz had moderate difficulties with "concentration, persistence, or pace."[298] On the one hand, Mr. Waltz could remember appointments, read regularly (and well), and processed spoken instructions (better than written instructions).[299] On the other hand, he felt that his mind drifted after only ten minutes, he did not handle stress or changes in his routine well, and his short-term memory was at times "mildly decreased."[300] With respect to (4), Mr. Waltz experienced no episodes of decompensation.[301]

Overall, the ALJ found that there was insufficient objective medical evidence to establish that Mr. Waltz had a disabling affective disorder, anxiety-related disorder, or substance-abuse disorder.[302]

Before considering the fourth step, the ALJ determined that Mr. Waltz had the residual-functional capacity ("RFC") to perform medium work, but with the following limitations: able to frequently balance, stoop, kneel, crouch, crawl, and climb; unable to climb ladders, ropes, or scaffolds; unable to have any exposure to high, exposed places or moving mechanical parts; able to understand, remember, and carry out only simple instructions and make simple work-related decisions; able to tolerate only occasional interaction with the public; able to perform routine tasks at a consistent pace, but not a production rate pace where each task must be performed within a strict time deadline; and he would be off task for five percent of the workday.[303]

---

[296] Id.

[297] Id.

[298] AR 26–27.

[299] AR 26.

[300] AR 26–27.

[301] AR 27.

[302] AR 27–28.

[303] AR 28.

The ALJ further provided:

> [Mr. Waltz's] generative disc disease and fatigue due to insomnia, plus hypertension (at times uncontrolled but not apparently controlled) and periodic sprains and strains justify a limitation to work at no more than a medium level of exertion, with corresponding postural limitations. [His] insomnia and side effects from medication make appropriate a prohibition on exposure to hazards. [His] anxiety and personality disorders result in a significant restriction on his contact with the public. [His] affective disorder makes necessary a limitation on the complexity of instructions he can process and perform and the pace at which he can do such things. Finally, [his] combined physical and mental impairments call for an allowance for the claimant to be off-task a small but significant portion of the workday (5%).[304]

At step four, the ALJ concluded that, because Mr. Waltz's past job as a sales representative exceeded his ability to perform work involving no more than simple instructions and only occasional interaction with the public, Mr. Waltz was unable to perform his past relevant work.[305]

At step five, the ALJ determined that, given Mr. Waltz's age, education, work experience and RFC, and based on the VE's testimony, "significant numbers" of jobs existed in the national economy that Mr. Waltz could perform.[306] The ALJ thus concluded that Mr. Waltz was not disabled.[307]

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should

---

[304] AR 37.

[305] *Id.*

[306] AR 38.

[307] AR 38–39. Because the ALJ found that Mr. Waltz was not disabled — even considering his "severe substance abuse impairment" — the ALJ did not consider the issue of "materiality" of drug and alcohol abuse. *See* 20 C.F.R. § 404.1535; 20 C.F.R. § 416.935.

uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of the listed specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then

the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

## ANALYSIS

Mr. Waltz contends that the ALJ erred by discrediting his testimony.[308] Specifically, Mr. Waltz argues that the ALJ erred by finding that his testimony was inconsistent with (1) objective medical evidence and treatment sought,[309] and (2) his work history.[310] The court disagrees.

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Second, if the claimant produces that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* (internal quotation marks and citations omitted). "At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness,

---

[308] Motion for Summary Judgment – ECF No. 26 at 5, 7–10.

[309] *Id*. at 7–9.

[310] *Id*. at 9–10.

inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained,

or inadequately explained, failure to seek treatment or follow a prescribed course of treatment."

*Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotation marks omitted). "[T]he ALJ

must identify what testimony is not credible and what evidence undermines the claimant's

complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citing *Lester v. Chater*, 81

F.3d 821, 834 (9th Cir. 2014)); *see, e.g.*, *Morris v. Colvin*, No. 16-CV-0674-JSC, 2016 WL

7369300, at *12 (N.D. Cal. Dec. 20, 2016).

Here, the ALJ gave specific, clear and convincing reasons for discounting Mr. Waltz's

testimony. Although Mr. Waltz discusses only two, the ALJ gave five reasons for discounting Mr.

Waltz's testimony. The court considers each in turn.

First, as Mr. Waltz points out, the ALJ found that Mr. Waltz's treatment history undercut the

accuracy of his testimony.[311] *See* 20 C.F.R. § 404.1529(c)(3)(iv) (identifying nature of treatment

as factor to consider when assessing subjective allegations). Specifically, the ALJ found that Mr.

Waltz's allegations about the severity of his impairments were "inconsistent with his history of

seeking minimal — or, at best, highly conservative — treatment."[312] *See Johnson v. Shalala*, 60

F.3d 1428, 1434 (9th Cir. 1995) ("conservative treatment" suggested "lower lever of both pain and

functional limitation"). For example, although Mr. Waltz claimed disabling mental impairments,

including bipolar disorder, depression, and anxiety, he did not regularly receive psychotherapy or

take psychotropic medication.[313] *See Ostenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001)

(finding ALJ properly rejected claimant's subjective complaints where he did not use medication

commonly prescribed for alleged symptoms).

Moreover, regarding Mr. Waltz's psychological impairments, the ALJ found that

> his comments to providers suggest he sought treatment for the primary purpose of
> obtaining benefits . . . . Vocational rehabilitation was suggested for the claimant, as

---

[311] *See* AR 33–34.

[312] AR 33.

[313] AR 32, 429.

an alternative to his expressed desire to receive disability benefits, and remaining out of the workforce was considered potentially damaging to [his] mental health.[314]

*See* 20 C.F.R. § 404.1529(c)(3)(vii)(4). On February 13, 2015, Mr. Waltz saw Dr. Karpowicz, in part, for "GA" (general assistance benefits).[315] As the ALJ pointed out, Dr. Karpowicz stated that it was "not entirely clear" what Mr. Waltz's underlying diagnosis was for his disabling symptoms.[316] He further noted that it was not clear that Mr. Waltz had a "severe enough illness that would make him completely unfit for work" and that it "may in fact be harmful for him to continue to be out of the workforce.[317] Although that opinion is reserved for the Commissioner, it is "indicative of the objective severity of [Mr. Waltz]'s impairment.[318]

Second, as Mr. Waltz discusses, the ALJ found Mr. Waltz's work history to be inconsistent with the alleged severity of his symptoms.[319] The ALJ observed that even though Mr. Waltz claimed to have difficulty getting along with coworkers and that he lost a job due to his alleged anger issues — the record did not demonstrate social issues in Mr. Waltz's past employment or volunteer work.[320] The ALJ noted that Mr. Waltz lived in a house with over 100 others and had no problem getting along with them.[321] The ALJ further noted that although Mr. Waltz was fired from his last job, he quit his previous job because he felt it "wasn't going anywhere."[322] *See Drouin v. Sullivan*, 966 F.2d 1255, 1256 (9th Cir. 1992) (finding ALJ properly rejected the claimant's pain testimony because the claimant was laid off from work for reasons unrelated to her pain). The ALJ's consideration of Mr. Waltz's work history was proper and supported by substantial evidence.

---

[314] AR 32.

[315] AR 583.

[316] AR 36, 583.

[317] AR 36; *see also* AR 583.

[318] AR 36.

[319] AR 34.

[320] AR 36.

[321] *Id.*

[322] AR 34; *see also* AR 82–83.

Third, the ALJ found that Mr. Waltz's activities of daily living demonstrated a level of functioning beyond his alleged level of functioning.[323] *See* 20 C.F.R. § 404.1529(c)(3)(vii)(4); *see also Orn*, 495 F.3d at 636 ("[I]nconsistencies . . . between [a claimant's] testimony and [his] conduct [or] daily activities" is a legitimate factor "in weighing a claimant's credibility."). For example, Mr. Waltz claimed disability in part based on anger issues and impatience with others.[324] He stated that he had difficulty being around others and that he was once fired from a job due to his anger issues.[325] But, as the ALJ noted, Mr. Waltz lived in a shelter with over 100 individuals.[326] He had no altercations with his cohabitants, was involved in a relationship with someone from his shelter, and got along well with authority figures, family, and friends.[327] The ALJ further noted that Mr. Waltz rode public transportation independently, volunteered, and attended appointments.[328]

Fourth, the ALJ found that the medical evidence undermined Mr. Waltz's claims of disabling limitations and supported his RFC for work involving simple instructions, simple work-related decision-making, limited social contact, flexible deadlines, and the ability to be off task for five percent of the workday.[329] Mr. Waltz failed to address the breadth of normal examination findings[330] or explain how the ALJ erred in weighing the medical evidence with respect to his RFC. The ALJ concluded that the medical evidence did not support Mr. Waltz's allegations.

---

[323] AR 26, 29, 33; *see also* AR 61–62, 315, 317–19, 320, 538.

[324] AR 33, 318, 320.

[325] AR 26, 318, 320.

[326] AR 36.

[327] AR 26, 33, 61–62.

[328] AR 26; *see also* AR 315, 317–19.

[329] AR 37.

[330] *See, e.g.*, AR 424–26 (where Dr. Kalman noted that Mr. Waltz was pleasant and cooperative, he spoke at an average rate and volume, and his eye contact was good; Mr. Waltz could relate to supervisors, co-workers, and peers, and he could withstand the stress and pressures associated with daily work); AR 583 (where Dr. Karpowicz opined that it was "not clear" that Mr. Waltz had "a severe enough illness that would make him completely unfit for work"); AR 430 (where Dr. Larson reported that Mr. Waltz was able to maintain focus throughout the evaluation with no need for redirection, gave good eye contact, had a pleasant attitude, and no "loose associations or confusion" were indicated);

Fifth, the ALJ found that Mr. Waltz's conflicting accounts of his cannabis and alcohol use undercut the accuracy of his allegations.[331] *See* 20 C.F.R. § 404.1529(c)(4) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence."); *Thomas v. Barnhart*, 278 F.3d 948, 959 (9th Cir. 2002) (rejecting claimant's statements where "the ALJ found that [the claimant] had not 'been a reliable historian, presenting conflicting information about her drug and alcohol usage'"); *Rusten v. Comm'r of Soc. Sec.*, 468 F. App'x 717, 719 (9th Cir. 2012) ("Inconsistent or dishonest statements about drug use can be used to infer a lack of veracity in the claimant's other assertions.") (citing *Thomas*, 278 F.3d at 959). For example, as the ALJ noted, Mr. Waltz testified that he had not used cannabis since January 9, 2014,[332] but the record shows that he reported using cannabis through at least March 2015.[333] The ALJ properly found that Mr. Waltz's inconsistent statements undermined his claims.

The court concludes that the ALJ gave specific, clear and convincing reasons for discounting Mr. Waltz's testimony.

## CONCLUSION

The court denies Mr. Waltz's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: November 13, 2018

LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California

---

AR 485 (where Dr. Gerson noted that Mr. Waltz was able to relate to him, follow instructions without difficulty, and was "not unstable").

[331] AR 29, 31–32, 34, 73, 534, 589.

[332] AR 34, 73.

[333] On November 7, 2014, Mr. Waltz told Dr. Kozart that he still used cannabis. AR 589; *see also* AR 535.